UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
RANDY J. FESSLER,                    : 09 Civ. 6905 (WHP) (JCF)
                                     :
            Plaintiff,               :       REPORT AND
                                     :       RECOMMENDATION
      - against -                    :
                                     :
MICHAEL J. ASTRUE, Commissioner of   :
Social Security,                     :
                                     :
            Defendant.               :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE WILLIAM H. PAULEY, U.S.D.J.:

        The plaintiff, Randy J. Fessler, brings this action pursuant

to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C.

§ 405(g), seeking review of a determination of the Commissioner of

the Social Security Administration (the "Commissioner").   That

determination affirmed a decision by an Administrative Law Judge

("ALJ"), which denied the plaintiff's application for Disability

Insurance Benefits on the ground that he was not disabled.   Each

party has submitted a motion for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure.   For the

reasons that follow, I recommend that the plaintiff's motion for

judgement on the pleadings be denied and the defendant's motion be

granted.

Background

        On October 31, 2001, Randy J. Fessler was involved in a motor

vehicle accident and treated at Community General Hospital of

1

Sullivan County for neck, back, and shoulder pain. (A. at 281).[1] As a result of the accident, Mr. Fessler contends that he continues to experience pain and spasms throughout his body and that he has a painful and inoperable back condition. (A. at 31). Spinal implants and a stimulator in his upper and lower back allegedly further limit his ability to move. (A. at 31). The plaintiff also claims to have a variety of other physical problems, including diverticulitis,[2] Hepatitis C, and kidney and testicle problems. (A. at 31).

As a result of these conditions, Mr. Fessler states that he suffers from pain in his arms and hands such that he cannot hold things; cannot stand for long periods; is unable to bend, lift, or twist; gets severe headaches, which limit his ability to focus and concentrate; has a limited ability to sleep and a decreased appetite; and suffers from depression. (A. at 31).

---

[1] "A." refers to the administrative record filed with the Court as part of the Commissioner's answer.

[2] Diverticulitis is an inflammation of a diverticulum, which is "a circumscribed pouch or sac of variable size occurring normally or created by herniation of the lining mucous membrane through a defect in the muscular coat of a tubular organ." Dorland's Illustrated Medical Dictionary ("Dorland's") 499-500 (28th ed. 1994).

Mr. Fessler takes several medications, including Baclofen,[3] Lexapro,[4] Lyrica,[5] and Methadone,[6] which he claims produce several adverse side effects, including constipation, blurry vision, nauseousness, dizziness, diarrhea, drowsiness, weakness, and loss of appetite. (A. at 32, 123). Mr. Fessler states that on a typical day he stays in bed as much as possible because of his pain, that he can only sit for a maximum of twenty minutes and stand for a maximum of approximately ten minutes, and that his wife takes care of him and attends to the household finances. (A. at 33-35).

---

[3] "Baclofen acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases. It also relieves pain and improves muscle movement." National Institutes of Health, Baclofen Oral: MedlinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (last visited Jan. 4, 2011).

[4] Lexapro, also known as Citalopram, is a selective seratonin re-uptake inhibitor that is used to treat depression. National Institutes of Health, Citalopram: MedlinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited Jan. 4, 2011).

[5] Lyrica, also known as Pregabalin, is used to relieve pain caused by damaged nerves in the arms, hands, fingers, legs, feet, or toes. National Institutes of Health, Pregabalin: MedlinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last visited Jan. 4, 2011).

[6] "Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers." National Institutes of Health, Methadone: MedlinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html (last visited Jan. 4, 2011).

A.   <u>Personal and Vocational History</u>

The plaintiff was born May 22, 1957, in Queens, New York.  (A. at 19).  He has a tenth grade education.  (A. at 19, 21).

Mr. Fessler is trained as an auto mechanic, and from 2003 to 2005 he worked as an auto mechanic supervisor at a used car dealership called Whalen Auto.  (A. at 21-22, 97).  He states that he worked as long as he was able, for a maximum of four to six hours a day.  (A. at 23).  He supervised employees, was allowed to sit and stand as he wished, and did not do any lifting.  (A. at 25).  Despite his supervisory role, Mr. Fessler testified that even minor physical work done during this period led to several hospital visits.  (A. at 22, 27).

Mr. Fessler's last date of employment was June 5, 2005.  (A. at 21).  At that time he could no longer continue working because his pain had become unbearable.  (A. at 27).  While employed, Mr. Fessler earned $8,650 in 2003, $24,600 in 2004, and $9,000 in 2005.  (A. at 92, 97).

B.   <u>Medical History</u>

Mr. Fessler has consulted numerous physicians for neck, back, and shoulder pain since his car accident.  Immediately after the accident, he was examined at Community General Hospital of Sullivan County and diagnosed with neck and back strain.  (A. at 284).  A cervical spine x-ray showed no evidence of fracture or

malalignment, but noted that there was a mild narrowing of the C5-C6 disc space and mild degenerative osteophyte formation[7] at the C4-C7 levels.  (A. at 286).

After diagnosing Mr. Fessler with degenerative disk disease[8] at C5-C6, Dr. Jack Stern performed an "anterior cervical diskectomy with subsequent fusion and plating"[9] on July 29, 2002.  (A. at 505-06).  On August 15, 2002, Mr. Fessler visited the emergency room for redness and swelling on his neck due to an infection at the site of the diskectomy.  (A. at 227, 229).  Cervical spine x-rays showed continued mild degenerative disease but no acute fracture. (A. at 236).  Between 2001 and late 2002, the plaintiff underwent physical therapy.  (A. at 166-76).

Throughout 2002, the plaintiff had a number of doctor visits and lab tests, and on December 23, 2002, Dr. Arvinder Singh gave him injections at the C4-C5 and C5-C6 levels to help manage his pain.  (A. at 210).  He noted that Mr. Fessler's prognosis was fair and that the surgery performed five months before had "helped 50-60%."  (A. at 211).   Dr. Singh recommended sedentary work and

---

[7] An osteophyte is a bony excrescence, or outgrowth of a bone. Dorland's at 1202.

[8] Degenerative disk disease is a deterioration of vertebral disks.  Dorland's at 435.

[9] A diskectomy is an "excision of an intervertebral disk." Dorland's at 492.

advised that Mr. Fessler should be careful in physical therapy. (A. at 211).

Dr. Xavier Aviles examined the plaintiff on August 27, 2004, and found that he was "minimally to moderately impaired," moved slowly and hesitantly, and was "partially disabled." (A. at 390-92). At a follow-up visit on October 13, 2004, Dr. Aviles reiterated that Mr. Fessler was "partially disabled," although he advised him to "continue working as an auto mechanic." (A. at 380-81). As of November 10, 2004, the plaintiff's condition remain unchanged. (A. at 384). Dr. Aviles noted that Mr. Fessler was still working as a mechanic but was avoiding "significant lifting and pushing that tends to aggravate his neck condition." (A. at 384).

On March 21-22, 2005, Mr. Fessler discussed his neck pain and work status with Dr. Vadim Kushnerik and Dr. Aviles. (A. at 397-99). On each occasion, Mr. Fessler stated that his job as a mechanic required "significant pushing, pulling, and lifting," and that these activities were causing him persistent neck pain. (A. at 398). Both doctors expressed the opinion that Ms. Fessler would benefit from not performing those activities. (A. at 398). As a result, Dr. Aviles found Mr. Fessler to be "totally disabled for his particular job." (A. at 398). Dr. Aviles maintained this diagnosis through June 2005. (A. at 350, 352).

To help control Mr. Fessler's pain, Dr. Kushnerik implanted a spinal cord stimulator in his back on March 30, 2005.  (A. at 400, 449).  On April 25, 2005, Mr. Fessler told Dr. Kushnerik that his pain was "one hundred percent better" and that he was trying to go back to work.  (Tr. at 401).  On May 9, 2005, he repeated that he was better but noted some limitations with activity.  (A. at 404).  On June 13, 2005, Dr. Kushnerik reported that Mr. Fessler had stopped working and "was better now."  (A. at 406).  An examination revealed that the plaintiff had a decreased range of motion and spasms in his neck, but that he also had full motor strength in all muscle groups and intact sensations.  (A. at 406).  His deep tendon reflexes were diminished on the right but normal on the left.  (A. at 406).  Dr. Kushnerik diagnosed neck pain, cervical radiculopathy, and cervical intervertebral disc disorder.[10]  (A. at 406).

On July 11, 2005, Mr. Fessler visited Dr. Kushnerik for a follow-up visit and reported trouble walking but no other new symptoms.  (A. at 407).  On July 25, 2005, he told Dr. Kushnerik that the stimulator helped with pain in his arms but that he was still experiencing neck pain when turning his head.  (A. at 408).

---

[10] Radiculopathy is a disease of the nerve roots including "compression of the cauda equina due to encroachment upon a congenitally small spinal canal by spondylosis."  Dorland's at 1404.  Spondylosis is degeneration of a bone.  Id. at 1564.

Mr. Fessler was examined again by Dr. Aviles on September 1, 2005. (A. at 409). He reported that he had run out of methadone about one and a half weeks prior and that the methadone had helped to increase his level of activity, but that it had not significantly reduced his pain. (A. at 409). Dr. Aviles diagnosed post-cervical fusion with radiculitis[11] and chronic low back pain. (A. at 409). Dr. Aviles concluded that Mr. Fessler was "totally disabled" from September 1 through November 1, 2005. (A. at 356, 357). Even so, Mr. Fessler reported to Dr. Kushnerik in October 2005 that his spinal cord stimulator was controlling his pain well, except for occasional spasms in his right arm and legs. (A. at 410).

In March 2006, Mr. Fessler complained of "burning" in the area of the spinal cord stimulator and stated that he thought it may be infected. (A. at 415). Dr. Aviles did not observe any redness, although he reported some rash on the generator site. (A. at 415). Later that week, Mr. Fessler went to the emergency room complaining of chronic pain related to his spinal cord stimulator, which he asserted was either dislodged or infected. (A. at 369). Dr. James Dwyer, however, found no evidence of infection other than Mr.

---

[11] Radiculitis is "inflammation of the root of a spinal nerve, especially that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's at 1404.

Fessler's own subjective complaints.  (A. at 371).  Mr. Fessler's sensation was intact bilaterally, his deep tendon reflexes were symmetric, and his strength was normal in his lower extremities. (A. at 369).

From May 24, 2006 to July 21, 2008, Mr. Fessler visited Dr. Douglas Schottenstein at Medical Pain Management on multiple occasions for examination and treatment.  (A. at 416-30, 516-77). On May 24, 2006, the plaintiff complained of neck pain that was exacerbated by twisting and alleviated with rest.  (A. at 416). Dr. Schottenstein performed a cervical medial branch block[12] at C4-C6.  (A. at 418).  He repeated this procedure at C4-C7 on June 28, 2006 and noted that Mr. Fessler's mental state, motor strength, and gait were normal.  (A. at 419-20).

At an August 30, 2006 appointment, Mr. Fessler described his pain as intermittent.  (A. at 422).  Dr. Schottenstein reported that Mr. Fessler's muscle strength was normal for his upper and lower extremities.  (A. at 422-23).  He also noted that direct pressure on Mr. Fessler's facet joints was positive and there was bilateral C3-C7 tenderness.  (A. at 423).  He diagnosed "post lami

---

[12] A cervical branch block helps relieve pain in the back by using a "controlled non-surgical heat lesion" to interrupt the nerves' pain signals.  Paul Dreyfuss, M.D., Cervical, Thoracic, Lumbosacral Medial Branch Block Information, http://www.spineuniverse.com/treatments/pain-management/cervical-thoracic-lumbosacral-medial-branch-block (last visited Jan. 4, 2011).

syndrome"[13] and cervical facet osteoarthritis,[14] advised continued medication for pain, and scheduled a cervical median branch block. (A. at 423).  On October 25, 2006, Dr. Schottenstein found that Mr. Fessler had full strength in his upper and lower extremities.  (A. at 402-03).

On January 11, 2007, Mr. Fessler complained of neck pain radiating to his right shoulder.  (A. at 427).  Dr. Schottenstein found no motor weakness for either of his shoulders and that his mental state and gait were normal.  (A. at 427-28).  A month later, when Mr. Fessler complained of the same symptoms, Dr. Schottenstein made similar findings.  (A. at 429-30).

---

[13] A laminectomy is a surgical procedure involving the removal of the lamina, "two small bones that make up a vertebra." National Institutes of Health, Laminectomy: MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/007389.htm (last visited Jan. 4, 2011).  Post-laminectomy syndrome sometimes occurs following a laminectomy and is characterized by sciatica, numbness, tingling, and muscle weakness.  What is post-laminectomy syndrome?, http://www.eorthopod.com/content/what-is-a-postlaminectomy-syndrome (last visited Jan. 4, 2011).

[14] Osteoarthritis is a "noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.  It is accompanied by pain (usually before prolonged activity) and stiffness (particularly after prolonged activity)." Dorland's at 1199.

On April 11, 2007, Dr. Schottenstein reported that Mr. Fessler's mental state was normal, his gait was antalgic,[15] and he had full strength in his lower extremities. (A. at 446). On June 6, 2007, Mr. Fessler's gait returned to normal and he had full strength in his upper extremities. (A. at 444). On June 8, 2008, a CT scan of the cervical spine revealed moderate cervical spondylosis. (A. at 578). The scan indicated normal vertebral alignment and moderate ostephyte complexes that "may cause" mild or moderate neural foraminal narrowing.[16] (A. at 578). On September 26, 2007, Dr. Schottenstein reviewed the CT scan and diagnosed facet osteoarthritis of the cervical spine, post cervical fusion,[17] and mild cervical radiculitis. (A. at 566). On December 26, 2007, Mr. Fessler's condition remained unchanged. (A. at 567). On March 26, 2008, Dr. Schottenstein indicated that Mr. Fessler's mental

---

[15] An antalgic gait is assumed to lessen or avoid pain. Dorland's at 90.

[16] Neural forminal narrowing occurs as the result of disc degeneration in the spine. The foramen is an opening in the spinal column through which nerves pass. As it narrows, pressure is exerted on the nerves, resulting in "pain, numbness, tingling, and muscle weakness." SpinalDisorders.com, Neural Foraminal Narrowing, http://www.spinaldisorders.com/neural-foraminal-narrowing.htm (last visited Jan. 4, 2011).

[17] A fusion is the act of merging adjacent parts or bodies. A cervical spinal fusion corrects instability when traumatic vertebral fractures do not heal with other techniques. Dorland's at 670.

11

state and gait were normal, his motor strength for his upper and lower extremities was full, and diagnosed cervical spondylosis, status post cervical fusion, and status post spinal cord stimulation. (A. at 568-69).

Dr. Schottenstein continued to examine Mr. Fessler regularly and reported that his complaints, condition, and physical examination findings were, essentially, the same on April 23, 2008, May 21, 2008, and June 18, 2008. (A. at 570-75). Similar to previous examinations, Mr. Fessler's motor functioning, mental state, and gait were normal. (A. at 570-75). On Mr. Fessler's April 23 visit, Dr. Schottenstein indicated that he would only prescribe a one-month supply of methadone, rather than the thee-month supply he had prescribed previously. (A. at 569, 571). On his June 18 visit, Dr. Schottenstein informed Mr. Fessler that he would have to take a urine toxicology test. (A. at 575). For all three examinations, the diagnosis was cervical spondylosis, post cervical fusion, and status post spinal cord stimulation. (A. at 571, 573, 575).

On July 21, 2008, Mr. Fessler returned and complained of severe neck and radiating upper extremity pain that was aggravated by sitting and prolonged lying down. (A. at 576). Dr. Schottenstein's examination revealed a normal gait and mental state, and cranial nerves within normal limits. (A. at 576). Dr.

Schottenstein also reported that Mr. Fessler's urine toxicology tested positive for cocaine and that he was a substance abuser. (A. at 577). Dr. Schottenstein informed Mr. Fessler that he would only provide him with a prescription for a thirty-day supply of pain medication, along with the names and addresses of three pain physicians, and that he would see him in the future only for non-opioid issues. (A. at 577).

During the period in which Mr. Fessler regularly visited Dr. Schottenstein, he was also evaluated by Dr. Rose Chan, a consulting physician. (A. at 438-41). At an examination on May 15, 2007, Dr. Chan observed that the plaintiff had a normal gait and stance, could walk on his heels and toes without difficulty, and could squat halfway. (A. at 439). She also observed that Mr. Fessler used no assistive devices but that he needed help changing for the examination and getting on and off the examination table. (A. at 439). However, she also observed that he could rise from his chair without difficulty. (A. at 439).

Dr. Chan found that Mr. Fessler had a full range of motion in his shoulders, hips, knees, and ankles. (A. at 440). However, Mr. Fessler did not allow Dr. Chan to perform strength testing of his upper extremities on the ground that he was afraid it would cause him pain. (A. at 441). Based on her examination, Dr. Chan diagnosed Mr. Fessler with herniated cervical disks, post cervical

fusion, and chronic generalized pain syndrome.  (A. at 441).  Her evaluation found moderate limitations on Mr. Fessler's ability to squat and move his neck freely.  (A. at 441).

    C.  <u>Psychiatric Examination</u>

On May 15, 2007, Mr. Fessler was examined by Dr. Leslie Helprin, a consulting psychologist.  (A. at 434-37).  He complained of difficulty sleeping due to pain, loss of appetite, dysphoric moods and irritability, depression, and social withdrawal.  (A. at 434).  Dr. Helprin reported that Mr. Fessler's manner of relating, social skills, and overall presentation were adequate; attention and concentration were mildly impaired; memory was impaired due to depression; and intellectual skills were below average.  (A. at 435-36).  Dr. Helperin found that Mr. Fessler was able to follow and understand simple directions and instructions.  (A. at 436).  She also noted that he could perform simple tasks and a few complex tasks.  (A. at 436).  Dr. Helperin concluded that Mr. Fessler's examination was "consistent with secondary psychiatric problems," which compound his medical issues and significantly interfered with his daily functioning.  (A. at 436).  She recommended that Mr. Fessler seek psychiatric intervention and undergo a medical evaluation to determine if his medical conditions precluded him from working over the long term.  (A. at 437).  However, she also

noted that, with the appropriate treatments, his prognosis was good.  (A. at 437).

D.   Procedural History

On January 23, 2007, Mr. Fessler filed an application for disability insurance benefits, alleging disability beginning on February 15, 2006.  (A. at 7, 40).  When his application was denied, he requested a hearing before an ALJ and appeared with his attorney on September 12, 2008, before ALJ Katherine Edgell.  (A. at 7, 14-39, 46-48).  At the hearing, Mr. Fessler changed his alleged onset date of disability to June 15, 2005.  (A. at 7, 17).  On October 1, 2008, the ALJ issued a decision finding that Mr. Fessler was not disabled.  (A. at 7-13).  That decision became the final determination of the Commissioner when the Appeals Council denied Mr. Fessler's request for review on June 26, 2009.  (A. at 1-3).  This action followed.

Discussion

A.   Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  Oneida Indian Nation v. City of Sherril, 337 F.3d 139, 152 (2d Cir. 2003); Morello v. Barnhart, No.

15

01 Civ. 0743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003); Carballo v. Apfel, 34 F. Supp. 2d 208, 213 (S.D.N.Y. 1999).

A federal court's review of a social security disability determination involves two levels of inquiry. First, the court reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008), report and recommendation adopted by 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). Second, the court must decide whether the Commissioner's decision was supported by substantial evidence. Tejada, 167 F.3d at 773.

Substantial evidence in this context is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam). In this review, it is important to keep in mind that the "Act is a remedial statute which must be liberally applied; its intent is inclusion rather than exclusion." Vargas v. Sullivan,

16

898 F.2d 293, 296 (2d Cir. 1990) (internal quotation marks and citation omitted); accord McCall v. Astrue, No. 05 Civ. 2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008).

    B.   The ALJ's Application of the Legal Standard

        1.  Determining Disability

A claimant is disabled under the Act and therefore entitled to benefits if he can demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has created a five-step procedure for evaluating disability claims.  20 C.F.R. § 416.920. First, the claimant must demonstrate that he is not currently engaged in a "substantial gainful activity."  20 C.F.R. § 416.920(b).  Next, the claimant must prove that he has a severe impairment that "significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).

Third, if the impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(d). However, if the claimant's impairment is neither listed nor equals any listed impairment, he must prove that he does not have the residual capacity to perform his past work. 20 C.F.R. § 416.920(e). Finally, if the claimant shows that he cannot engage in his previous employment, the burden shifts and the Commissioner must prove that there is other work the claimant could perform. 20 C.F.R. § 416.920(g)(1); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Gianotti v. Barnhart, No. 06 Civ. 909, 2007 WL 582755, at *8 (S.D.N.Y. Feb. 22, 2007).

     2.  <u>The ALJ's Decision</u>

The ALJ applied the correct legal standard to Mr. Fessler's claim. At step one, the ALJ found that Mr. Fessler had not engaged in substantial gainful activity since June 15, 2005. (A. at 9). At step two, she determined that Mr. Fessler's degenerative disk disease, cervical arthritis, spinal stimulator, prior surgical fusion, and depression were "severe" impairments. (A. at 9). However, the ALJ determined at step three that none of Mr. Fessler's impairments, nor any combination of those impairments, met or medically equaled one of the listed impairments in the regulations. (A. at 10). The ALJ concluded that neither Mr.

18

Fessler's mental impairment nor his spinal injury was sufficient to qualify as a disability. (A. at 10). Based on her review of the entire record, the ALJ determined at step four that Mr. Fessler had the residual functional capacity to lift and carry up to twenty pounds, or ten pounds frequently, and to sit, stand, or walk for up to six hours. (A. at 10). The ALJ found that although Mr. Fessler's depression "would reasonably interfere with [his] ability to engage in highly complex or detailed tasks, [] other mental tasks remain[ed] within his capability" and his "medical reports indicate[d] that [he] maintain[ed] a high level of functioning." (A. at 10, 12). After taking into account all of the relevant medical evidence, as well as Mr. Fessler's own testimony, the ALJ found that he had the physical and mental capacity to perform his past work as the supervisor of an automobile repair shop. (A. at 13).

   C.  <u>Substantial Evidence</u>

The plaintiff challenges the ALJ's decision on four grounds. He argues that she (1) incorrectly assessed his prior ability to work, (2) improperly applied the treating physician rule, (3) failed to consider the combined effect of his various disabilities, and (4) did not appropriately credit his subjective complaints of pain. I will address each of these in turn.

19

1.   <u>Ability to Engage in Previous Work</u>

Mr. Fessler first alleges that the ALJ erred in finding that he could perform his past work as an auto mechanic supervisor. (Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Pl. Memo.") at 12-15).  After reviewing the record in its entirety, it is clear that the ALJ properly developed a detailed understanding of Mr. Fessler's past job responsibilities, determined that his work qualified as substantial gainful activity, and subsequently concluded that those duties could still be performed.  Because her findings are supported by substantial evidence, they should be upheld.

First, the ALJ correctly investigated Mr. Fessler's past job responsibilities.  At his hearing, Mr. Fessler admitted that he worked part-time from 2003 to 2005, as his condition allowed, by inspecting cars and assigning work to mechanics.  (A. at 22-23). He stated that he set his own schedule, that his boss was aware of his condition and did not require him to do any lifting, and that he would take breaks as needed.  (A. at 23, 25).

Second, contrary to Mr. Fessler's assertion, the ALJ properly investigated his past earnings to determine whether they qualified as substantial gainful activity.  (Pl. Memo. at 11-12).  The record supports such a finding.  It shows that Mr. Fessler earned $8,650 in 2003, $24,600 in 2004, and $9,000 in 2005 while at Whalen Auto.

(A. at 92, 97).  According to the Commissioner's Program Operation
Manual ("POM"), if Mr. Fessler's average monthly earnings were
greater than $800 for 2003, $810 for 2004, or $830 for 2005, he was
engaged in substantial gainful activity.  20 C.F.R. §
404.1574(b)(2)(ii); Social Security Online, Table DI 10501.015,
available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0410501015.
Mr. Fessler's average monthly earnings clearly exceeded the POM
requirements.  The ALJ noted this fact, observing that he earned "a
fair amount" in 2004, and properly found that this work constituted
substantial gainful activity.[18]  (A. at 22).

     Third, the ALJ's finding that Mr. Fessler is capable of
performing his past work as an auto-shop supervisor is supported by
substantial evidence.  In her decision, the ALJ references the

---

     [18] There is disagreement between the parties about Mr.
Fessler's average monthly earnings.  Mr. Fessler contends that in
two of the three years he worked at Whalen Auto, his average
monthly earnings were below the average requirements set forth in
the POM.  (Pl. Memo. at 1-2, 12). While Mr. Fessler contends that
his average monthly earnings for 2005 were $720.83, the
Commissioner asserts that they were $1,500.  (Pl. Memo. at 1;
Memorandum of Law in Support of Defendant's Cross-Motion for
Judgment on the Pleadings ("Def. Memo.") at 21 n.12).  This
disagreement stems from the plaintiff's improper calculations.
Instead of calculating his average earnings over the course of the
six months he worked in 2005, Mr. Fessler averaged that income over
the entire year, thus halving his monthly wage.  Moreover, it is
indisputable that Mr. Fessler was engaged in substantial gainful
activity in 2004 because, even assuming he received a pay check
each month, his average monthly wage was $2,050.  (A. at 92, 97;
Def. Memo. at 21 n.12).

plaintiff's medical reports from his three treating physicians, Drs. Aviles, Goldstein, and Kushnerik, and concludes that "while progress notes . . . reflect a multitude of subjective complaints, they are not consistent with objective medical data in either their nature or severity." (A. at 11). The ALJ further stated that the doctors' "progress notes fail to document significantly limited motion, gait abnormality, straight leg raising or decreased muscle strength. Instead they find the claimant neurologically intact, with normal reflexes." (A. at 11). In addition to the medical reports, the ALJ noted that Mr. Fessler himself had stated that his various medications and the spinal cord stimulator left him feeling "100 percent better." (A. at 11). She also cited medical examinations in March and July of 2008, which "revealed intact sensation and normal strength throughout all the muscle groups in [his] upper and lower extremities." (A. at 11). While the ALJ acknowledged that direct pressure on Mr. Fessler's facet joints provoked a response and that he had some limited motion in his cervical spine, she noted that his range of motion was otherwise normal with normal gait and station. (A. at 11). Finally, the ALJ cited Dr. Chan's examination, which determined that Mr. Fessler was only moderately limited in his squatting and neck movements. (A. at 11). Additional evidence in the record that the ALJ did not cite provides further support for her determination. Most

persuasive are the medical records from Mr. Fessler's visits with Dr. Schottenstein, who consistently reported his normal mental functioning, gait, and strength in his extremities. (A. at 427-30, 444, 568-77).

### 2.  Treating Physician Rule

Mr. Fessler next alleges that the ALJ erred by failing to credit the opinions of his treating physician, Dr. Aviles.  (Pl. Memo. at 15-18).  Specifically, Mr. Fessler argues that the ALJ did not give credit to Dr. Aviles' determination that he was "totally disabled for his particular job" and failed to provide adequate reasons for disregarding this opinion.  (Pl. Memo. at 17-18; A. at 398).

A treating physician's report is to be given more weight than other reports and will be controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, opinions related to "dispositive" issues, such as whether a claimant "meet[s] the statutory definition of disability," are reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  Under 20 C.F.R. § 404.1527, not only may the reports of consultative or non-examining physicians constitute substantial evidence as to disability, but they may override the

opinions of treating physicians in appropriate circumstances.  20
C.F.R. § 404.1527(d)(2); see Snell v. Apfel, 177 F.3d 128, 132-33
(2d Cir. 1999); Cruz v. Barnhart, No. 04 Civ. 9011, 2006 WL
1228581, at *11-14 (S.D.N.Y. May 8, 2006) (consultative
examinations given controlling weight over treating physician's
opinion that was not consistent with medical record, claimant's
daily activities, or opinions of other physicians); Punch v.
Barnhart, No. 01 Civ. 3355, 2002 WL 1033543, at *12 (S.D.N.Y. May
21, 2002) (noting that "the report of a consultative physician can
constitute substantial evidence" in overriding opinion of treating
physician).

The record indicates that the ALJ gave significant weight to
Dr. Aviles' medical opinion and properly followed the treating
physician rule.  The ALJ observed that despite finding Mr. Fessler
"totally disabled for his particular job," Dr. Aviles specifically
stated that the job in question was that of an auto mechanic, not
an auto mechanic supervisor, and that auto mechanics do
"significant pushing, pulling and lifting."  (A. at 12, 398).
Since Mr. Fessler testified that his work as an auto mechanic
supervisor did not require him to do any lifting or heavy work, the
ALJ's determination is consistent with Dr. Aviles' medical opinion.
(A. at 23, 25).  Furthermore, the ALJ explicitly recognized Dr.
Aviles' opinion on this point, noting that his recommendation only

precluded plaintiff from engaging in work that required significant pushing, pulling, and lifting.  (A. at 12).

The plaintiff also argues that the ALJ erred by ignoring Dr. Aviles' finding that he was "totally disabled" from March 22 through June 13, 2005, and again from September 1 through November 1, 2005.  (Pl. Memo. at 17).  Dr. Aviles' findings of disability from March 22, 2005 to April 6, 2005, and from April 25, 2005 to June 13, 2005 do not support a finding of disability by the Commissioner because these determinations were prior to June 15, 2005, the alleged onset date of disability.  (A. at 7, 350, 352, 398).  Evidence that Mr. Fessler was feeling "100 percent better" on April 25, 2005 also supports the ALJ's finding of no disability for this period.  (A. at 404).  Dr. Aviles' subsequent diagnosis of "totally disabled" from September 1, 2005 to November 1, 2005 is insufficient on its own to support an ultimate finding of disability.  (A. at 356, 357).  Although it falls within the alleged dates of disability, this two-month period is less than the twelve-month minimum required to satisfy the legal definition of disability.  42 U.S.C. § 423(d)(1)(A).

3.  Combination of Impairments

Next, Mr. Fessler argues that the ALJ did not properly explain her finding that his impairments did not meet or equal in severity those listed in the regulations, either alone or in combination.

(Pl. Memo. at 18).   However, this allegation also is not supported by the record.   In her opinion, the ALJ made clear that she had consulted the statutory list of impairments and found that neither Mr. Fessler's mental impairment nor his spinal impairment met the listed requirements.   (A. at 10).   His argument that the combination of his impairments qualifies as a disability pursuant to 20 C.F.R. § 404.1526 also lacks merit.   (Pl. Memo. at 18). Although that provision allows for a finding of disability if a combination of impairments equals a listed impairment, Mr. Fessler has failed to advance any listing that the combination of his impairments would satisfy.   20 C.F.R. § 404.1526; (Pl. Memo. at 18).

Moreover, the medical evidence does not support the conclusion that the combination of Mr. Fessler's mental and physical impairments restricts him from working.   Although Dr. Helperin suggested that Mr. Fessler undergo a "medical evaluation" to determine whether his physical conditions "preclude him from working over the long term," she did not suggest that his physical functioning was hampered by his depression and found that his "manner of relating, social skills, and overall presentation were adequate."   (A. at 435, 437).   Progress notes from Mr. Fessler's treating physicians consistently reveal a "normal" mental state, and  physical examinations in March through July of 2008 revealed

intact sensation and normal strength throughout all muscle groups in his upper and lower extremities. (A. at 568-77). With his treating physicians diagnosing him with a normal mental state and muscle strength, it is difficult to see how the combination of the two would restrict Mr. Fessler from engaging in light work activity as an auto-shop supervisor.

### 4. Credibility and Subjective Complaints of Pain

Finally, Mr. Fessler argues that the ALJ erred in evaluating his credibility and did not give proper consideration to his subjective complaints of pain. (Pl. Memo. at 19-20). In determining whether a claimant is disabled, the ALJ must consider subjective evidence of pain or disability as testified to by the claimant. 20 C.F.R. § 404.1529(a). However, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." Davis v. Massanari, No. 00 Civ. 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001).

In Mr. Fessler's case, it is clear that the ALJ properly considered both the medical evidence and the petitioner's subjective complaints of pain before making her final determination that he is able to perform his past work. In her opinion, the ALJ stated that the evidence did "not contain laboratory signs or

27

findings which could reasonably be expected to impose limitations, to the degree of severity alleged by the claimant on his ability to perform basic work functions." (A. at 11). Thus, she concluded that Mr. Fessler's complaints of pain were not credible only after comparing them to the medical evidence and finding them unsupported.

A review of the record also indicates substantial support for this determination. Dr. Chan found only moderate limitation to the plaintiff's squatting and neck movements. (A. at 441). Similarly, numerous progress reports from Dr. Schottenstein revealed full muscle strength in all of Mr. Fessler's extremities and a normal gait. (A. at 369, 402-03, 410, 411, 413, 416-17, 420-21, 422-23, 425, 427-30, 444, 446-47, 568-78). Based on a complete review of the record, there is substantial evidence to support the ALJ's finding that Mr. Fessler is capable of performing his past work as an auto-shop supervisor. (A. at 13).

Conclusion

For the reasons set forth above, I recommend that the Commissioner's motion be granted and the complaint be dismissed. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed

with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 2210, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         January 10, 2011

Copies mailed this date to:

Irwin M. Portnoy, Esq.
Irwin M. Portnoy and Associates, PC
542 Union Avenue
New Windsor, New York 12553

John E. Gura, Jr., Esq.
Assistant United States Attorney
86 Chambers Street
New York, New York 10007